IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FORT SMITH DIVISION

WILLIAM SCOTT THOMAS GOYETTE                                          PLAINTIFF

vs.                              Civil No. 2:20-cv-02222-PKH-MEF

KILOLO KIJAKAZI, Acting Commissioner,[1]
Social Security Administration                                        DEFENDANT

## <u>MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION</u>

Plaintiff, William Scott Thomas Goyette ("Goyette"), brings this action pursuant to 42

U.S.C § 405(g), seeking judicial review of a decision of the Commissioner of the Social Security

Administration (the "Commissioner") denying his claims for a period of disability, disability

insurance benefits ("DIB"), and supplemental security income ("SSI") under Titles II and XVI of

the Social Security Act ("the Act"), 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).  In this judicial

review, the Court must determine whether there is substantial evidence in the administrative record

to support the Commissioner's decision.  42 U.S.C. § 405(g).

## I.    Procedural Background

Goyette filed his applications for benefits on May 17, 2018, and June 20, 2018, alleging an

onset date beginning January 1, 2018, due to post-traumatic stress disorder ("PTSD"), bipolar

disorder, schizophrenia, attention-deficit disorder/attention-deficit/hyperactivity disorder

("ADD/ADHD"), anxiety, nerve damage from burns, severe skin burns from oil, and high blood

pressure.  (ECF No. 14-2, p. 13; ECF No. 14-3, pp. 4-5, 21-22, 41-42, 60-61; ECF No. 14-6, p.

---

[1] Kilolo Kijakazi became Acting Commissioner of the Social Security Administration on July 9, 2021.  Pursuant
to Rule 25(d) of the Federal Rules of Civil Procedure, Kilolo Kijakazi should be substituted as the defendant in this
suit.  No further action needs to be taken to continue this suit by reason of the last sentence of section 205(g) of the
Social Security Act, 42 U.S.C. § 405(g).

15).  He was 31 years old on the alleged onset date.  (ECF No. 14-2, p. 25).  He has past relevant work ("PRW") as a concrete laborer/construction worker.  (*Id*., pp. 24-25).

The Commissioner denied his applications initially and on reconsideration.  (ECF No. 14-4, pp. 5-11, 14-17).  At Plaintiff's request (*Id*., pp. 19-26), an Administrative Law Judge ("ALJ"), the Hon. Harold D. Davis, held an administrative hearing on March 26, 2020.  (ECF No. 14-2, pp. 34-64).  Plaintiff was present and represented by counsel.

On April 28, 2020, the ALJ found that Goyette had the following severe impairments: old, healed burn injuries, lumbar fractures, major depressive disorder, and post-traumatic stress disorder.  (ECF No. 14-2, p. 15).  The ALJ concluded that his impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id*., p. 16).  The ALJ determined that Goyette retained the residual functional capacity ("RFC") to do the following:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except that the claimant can perform work involving simple tasks, i.e. learned by rote, simple instructions with few variables, and only incidental contact with the public.  Supervision is direct and concrete.  (*Id*., p. 17).

With the assistance of a vocational expert ("VE"), the ALJ found that Goyette could perform work as a merchandise marker, housekeeping cleaner, and canning machine tender.  (ECF No. 14-2, pp. 26-27).  He concluded Goyette had not been under a disability as defined by the Act from January 1, 2018, through the date of the ALJ's decision on April 28, 2020.  (*Id*., p. 26).

The Appeals Council denied Plaintiff's request for review on October 2, 2020.  (ECF No. 14-2, pp. 2-6).  He subsequently filed this action on December 7, 2020.  (ECF No. 1).  This matter is before the undersigned for report and recommendation.  Both parties have filed appeal briefs (ECF Nos. 17, 18), and the case is ready for decision.

## II.    Applicable Law

This Court's role is to determine whether substantial evidence supports the Commissioner's findings. *Vossen v. Astrue*, 612 F.3d 1011, 1015 (8th Cir. 2010). Substantial evidence is less than a preponderance, but enough that a reasonable mind would find it adequate to support the Commissioner's decision. *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011). We must affirm the ALJ's decision if the record contains substantial evidence to support it. *Blackburn v. Colvin*, 761 F.3d 853, 858 (8th Cir. 2014). If there is substantial evidence in the record that supports the Commissioner's decision, the Court may not reverse it simply because substantial evidence exists in the record that would have supported a contrary outcome, or because the Court would have decided the case differently. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015). In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, we must affirm the ALJ's decision. *Id*.

A claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir. 2001); *see also* 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A). The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D). A claimant must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months. The disability determination process is not an adversarial process; instead, the Commissioner's

duty exists alongside the claimant's burden to prove his case.  *See Noerper v. Saul*, 964 F.3d 738 (8th Cir. 2020).

The Commissioner's regulations require her to apply a five-step sequential evaluation process to each claim for disability benefits: (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  The fact finder only considers Plaintiff's age, education, and work experience in the light of his residual functional capacity if the final stage of the analysis is reached.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

## III.    Summary of the Medical Evidence

Goyette was admitted to Arkansas Children's Hospital on January 25, 2016, for second degree burns to multiple areas of his body after a welding accident.  (ECF No. 14-7, pp. 14, 19-25).  He sustained a six percent total body surface area mixed partial/full thickness flame burn to his face and right hand. (*Id*., p. 19).  He had ADHD and had no prescription for Adderall in a year, but he did obtain Adderall from other sources.  (*Id*.).  He is an everyday smoker, drinks occasionally, and admitted to rare recreational marijuana use.  (*Id*.).  He tolerated bath and non-excisional debridement with 30 mg of intravenous morphine.  (*Id*.).  The next day Goyette underwent formal debridement with sedation.  (*Id*., p. 24).  He manifested no nausea or emesis, had normal bowel and bladder function, and was ambulating well.  (*Id*.).  His physical exam was mostly normal except for his skin affected by the burns.  (*Id*., p. 21).  Goyette tolerated wound care

and by the day of discharge his pain was controlled.  (*Id.*, p. 24).  He was discharged and ordered to return for a follow-up appointment on February 4, 2016.  (*Id.*, p. 25).

On February 4, 2016, Goyette returned to Arkansas Children's Hospital for a follow-up appointment regarding flash burns to his face, neck, torso, and bilateral hands.  (ECF No. 14-7, pp. 14-15).  Anna Rinewalt, M.D., opined Goyette had some difficulty with pain control as 5 mg of Oxycodone was not working very well for him.  (*Id.*).  Goyette continued to take Gabapentin three times a day and was eating well.  (*Id.*, p. 14).  He had no problems with fevers, chills, or purulent drainage from any of his wound sites.  (*Id.*).  His vitals were stable, and he was afebrile, however, he appeared very anxious.  (*Id.*).  According to Dr. Rinewalt, all Goyette's wounds to his face, neck, and right upper extremity were essentially healed, although, those areas retained some mild hyperemia, but no hypertrophic scarring.  (*Id.*).  Although Goyette had some reduced range of motion solely related to pain, Dr. Rinewalt found no signs of cellulitis and the edema of Goyette's hand was minimal.  (*Id.*, p. 15).  Dr. Rinewalt increased Goyette's Oxycodone dosage from 5 to 10 mg and encouraged him to increase his Gabapentin from 300 to 600 mg three times a day.  (*Id.*).

Goyette was seen again at Arkansas Children's Hospital on February 15, 2016, for another follow-up appointment regarding his burns.  (ECF No. 14-7, pp. 10-11).  He still had an open wound and some fibrinous debris to his right hand, however, everything else was essentially healed.  (*Id.*, p. 10).  To help with neuropathic pain, his Gabapentin dosage was increased.  (*Id.*).  There was no significant edema to the hand, but Goyette had difficulty moving it and complained of significant pain described as burning palpation.  (*Id.*).  Dr. Rinewalt encouraged Goyette to continue using the Elta and to do scar massage to decrease his sensitivity as Goyette admitted to not doing that.  (*Id.*).  Dr. Rinewalt instructed him to continue with the Gabapentin three times a

day and refilled his prescription. (*Id.*). Goyette was ordered to return in 10 days for re-evaluation. (*Id.*).

Goyette returned to Arkansas Children's Hospital on February 26, 2016, for his follow-up appointment. (ECF No. 14-7, pp. 6-7). According to Dr. Rinewalt, Goyette was essentially healed at his previous visit, except for some very small areas on his right hand that were associated with folliculitis. (*Id.*, p. 6). Goyette was encouraged to continue taking Gabapentin and was given Bactroban for the folliculitis. (*Id.*). He stated he was doing well and has had no other problems with any new areas of folliculitis. (*Id.*). A couple of small areas that were opened from his burn were now closed and his range of motion completely returned. (*Id.*). Dr. Rinewalt specifically noted that the burns Goyette sustained were now completely healed and there was no indication of significant scarring. (*Id.*, pp. 6-7). Goyette was encouraged to continue with Elta, sunscreen, and to monitor his sun exposure to prevent dyspigmentation. (*Id.*, p. 7).

On March 18, 2017, Goyette was admitted to Johnson Regional Medical Center hospital, requesting medication for PTSD. (ECF No. 14-7, pp. 43-46). His physical exam showed some normal findings, but his blood pressure was high, his affect was anxious, and his judgment and concentration were poor. (*Id.*, p. 44). Goyette had concerns of PTSD and ADHD, however, he did not want to see Dayspring Behavioral Health where he had been going for treatment. (*Id.*). Goyette also reported self-medicating but wanted medication so he could get a job. (*Id.*). According to Rebekah Mize, CNP, Goyette's speech was rapid, and he was not a good historian. (*Id.*). Goyette wanted psychiatric help but did not know how to go about finding it, insisting that he is "not going back to that place in Lamar." (*Id.*). CNP Mize's discharge diagnoses included PTSD, methamphetamine abuse complications, and ADHD. (*Id.*, p. 45). Goyette was instructed to follow up with his primary care provider as soon as possible. (*Id.*).

On May 4, 2017, Goyette presented to William Williams, D.O., to establish care for his ADHD. (ECF No. 14-7, pp. 135-137). Goyette had trouble focusing, complained of anger issues, and mood swings. (*Id*., p. 135). His physical examination revealed normal findings, however, Dr. Williams diagnosed him with mood disorder due to known physiological condition, and nicotine dependence. (*Id*.). Dr. Williams prescribed Risperidone and instructed Goyette to return to the clinic as needed or if problems develop or worsen. (*Id*., p. 137).

Goyette was seen by Scott Kuykendall, M.D., on July 3, 2017, for a wellness exam. (ECF No. 14-7, pp. 132-134). Goyette complained of anxiety, nightmares, and paranoia. (*Id*., p. 132). He also wanted to discuss his medication options and wanted to get back on something, although he was nervous to take medications. (*Id*.). Goyette stated he occasionally smoked marijuana, and he revealed hallucinations that people were taking things away from him. (*Id*.). His physical exam was mostly normal, except he was very hyper and anxious. (*Id*., p. 133). Dr. Kuykendall diagnosed paranoid personality disorder, nicotine dependence, encounter for general adult medical examination without abnormal findings, major depressive disorder, and anxiety disorder. (*Id*.). Dr. Kuykendall prescribed Vraylar, discontinued Risperidone, and referred Goyette to Counseling Associates. (*Id*., pp. 133-134). Dr. Kuykendall also counseled and encouraged Plaintiff to stop using tobacco products and to stop all alcohol and illegal drug use. (*Id*.).

On July 15, 2017, Goyette was admitted to Saint Mary's Regional Medical hospital complaining of PTSD. (ECF No. 14-7, pp. 51-68). He reported feeling "broken" with lots of "problems." (*Id*., p. 51). According to Terry D. Peery, M.D., Goyette wanted help with his anger issues and wanted to be admitted to Turning Point Behavioral Health Unit, stating his "life will be over" if he is not admitted. (*Id*.). Goyette denied suicidal ideation, homicidal ideation, and visual hallucinations. (*Id*.). His physical examination revealed normal findings. (*Id*., p. 53). He did not

think he heard voices, but that sometimes he would talk to himself out loud.  (*Id*.).  He also admitted to using methamphetamine the previous day.  (*Id*.).

The same day, Goyette was transferred via ambulance transport from Saint Mary's Regional Medical hospital and admitted to Rivendell Behavioral Services of Arkansas psychiatric hospital ("Rivendell") for acute in-patient psychiatric care.  (ECF No. 14-7, pp. 60, 72-88).  Goyette was admitted to Rivendell due to paranoia, suicidal statements, and homicidal ideation.  (*Id*., p. 72).  He needed treatment because of his PTSD and stated he could be "dangerous."  (*Id*.).  John Leach, M.D., opined Goyette displayed disorganized thought process and extreme paranoia.  (*Id*.).  Goyette reported that he was set on fire by a former employer and had suffered PTSD since that incident.  (*Id*.).  According to Dr. Leach, Goyette was a poor historian due to disorganized thought process and persecutory delusions.  (*Id*.).  Goyette endorsed suicidal statements claiming that he is unable to live without his wife and children.  (*Id*.).  He acknowledged his wife was in the process of filing for divorce.  (*Id*.).  Notably, Goyette made several homicidal statements throughout the assessment, threatening "anyone that bothers me."  (*Id*.).  Dr. Leach noted agitated behavior, pressured speech, labile affect, and manic mood.  (*Id*.).  A urine drug screen revealed Goyette was positive for amphetamines and THC.  (*Id*., p. 73).  Dr. Leach diagnosed Plaintiff with unspecified psychotic disorder and cognitive disorder due to traumatic brain injury.  (*Id*.).  10 days later, at the time of discharge, Goyette denied suicidal or homicidal ideation and reported an improvement with his mood.  (*Id*.).  Dr. Leach prescribed Benadryl for extrapyramidal side effects ("EPS"), Depakote for mood stability, Gabapentin for anxiety and mood, and Risperdal for mood.  (*Id*.).  Goyette was instructed to follow up with Counseling Associates in Clarksville on July 27, 2017, for individual therapy and medication management.  (*Id*.).

On August 14, 2017, Goyette presented to Counseling Associates as instructed.  (ECF No. 14-7, pp. 92-93).  He was well-groomed, his affect was full, but his mood was irritable.  (*Id*., p. 92).  Goyette stated he has ADHD, is impulsive, and was diagnosed with bipolar disorder when he was hospitalized at Rivendell.  (*Id*.).  Ludwig James Aszod, LPC, observed that Plaintiff was defensive and mistrustful at the beginning of his interview.  (*Id*)  Goyette admitted he was self-medicating and refused to disclose what he was self-medicating with.  (*Id*.).  Goyette became cooperative by the end of the interview.  (*Id*.).  He stated he was doing much better and trying to be a better person; he denied suicidal and homicidal ideation but was impulsive; he stated his former employer tried to kill him by lighting up an acetylene tank that he was holding, and it exploded.  (*Id*.).  He also confirmed that he and his ex-wife were getting along well recently, and he could rely on his ex-wife now and reported his children as barriers to doing anything crazy.  (*Id*.).  He was unsure if he wanted to begin treatment, and LPC Aszod noted Goyette appeared "fairly stable."  (*Id*.).  LPC Aszod informed Goyette that the likelihood of prescribing stimulants was minimal, given the fact that Goyette had not taken any stimulants since he was 16 years old.  (*Id*.).  This angered Goyette, however, he planned on staying clean and involved in drug court.  (*Id*.).  He promised to call the clinic, hotline, or go to the emergency room if he felt unable to control his anger, and he was provided an initial contact form to complete and return if he wanted to start therapy.  (*Id*.).

The same day, Goyette returned to Dr. Kuykendall wanting to discuss his medications.  (ECF No. 14-7, pp. 129-131).  Goyette was diagnosed with insomnia, nicotine dependence, and major depressive disorder, recurrent, mild.  (*Id*., p. 130).  Dr. Kuykendall decreased Goyette's Risperidone dosage, discontinued Gabapentin and Vraylar, and changed his Divalproex.  (*Id*., pp.

130-131).  Dr. Kuykendall counseled and encouraged Goyette to stop using tobacco products and return to the clinic if his problems worsen or develop.  (*Id.*, p. 131).

One month later, on September 14, 2017, Goyette returned to Dr. Kuykendall to again discuss his medications.  (ECF No. 14-7, pp. 121-123).  Dr. Kuykendall diagnosed Goyette with ADHD, combined type, nicotine dependence, and bipolar disorder.  (*Id.*, p. 122).  Goyette's physical exam was normal, and Dr. Kuykendall encouraged him to stop using tobacco products. (*Id.*).

A week later, on September 21, 2017, Goyette returned to Dr. Kuykendall complaining of a fever, headaches, shortness of breath, and white sputum.  (ECF No. 14-7, pp. 118-120).  His physical examination was normal.  Dr. Kuykendall diagnosed Goyette with ADHD, combined type, bipolar disorder, and periapical abscess without sinus.  (*Id.*, p. 119).  Goyette stated his tobacco patch helps.  (*Id.*, p. 118).  Dr. Kuykendall prescribed Cephalexin and encouraged him to stop using tobacco products.  (*Id.*).

On October 13, 2017, Goyette returned to Dr. Kuykendall with cut on his left knee and wanted to discuss his medications.  (ECF No. 14-7, pp. 112-114).  Goyette stated the Risperidone medication caused him to pass out and gave him crazy dreams.  (*Id.*, p. 112).  His physical exam was again normal, and Dr. Kuykendall diagnosed Goyette with unspecified open wound, left knee, initial encounter, nicotine dependence, and bipolar disorder.  (*Id.*, p. 113).  Cephalexin, Risperidone, and Diazepam were prescribed.  (*Id.*, p. 113-114).  He was also encouraged to stop using tobacco products and to follow up in one year or sooner if problems develop or worsen.  (*Id.*, p. 114).

Goyette saw Dr. Kuykendall again on November 13, 2017, complaining of coughing, sneezing, and needing his medications refilled.  (ECF No. 14-7, pp. 109-111).  His physical exam

was normal, and Dr. Kuykendall diagnosed him with acute maxillary sinusitis, nicotine dependence, and bipolar disorder. (*Id*., p. 110). Dr. Kuykendall prescribed Chantix and discontinued Cephalexin. (*Id*., p. 111). Goyette was instructed to stop using tobacco products and follow up in six months. (*Id*.).

On January 17, 2018, Goyette reported to Dr. Kuykendall for a wellness exam and prescription refills. (ECF No. 14-7, pp. 103-105). Goyette's physical exam was normal. Dr. Kuykendall diagnosed him with gastro-esophageal reflux disease without esophagitis, nicotine dependence, bipolar disorder, unspecified, and encounter for general adult examination without abnormal findings. (*Id*., p. 104). Dr. Kuykendall discontinued the Nicoderm patch and Prilosec. (*Id*., p. 105).

On March 27, 2018, Goyette returned to Dr. Kuykendall for a checkup appointment and medication refills. (ECF No. 14-7, pp. 100-102). Dr. Kuykendall diagnosed somnolence, nicotine dependence, and bipolar disorder. (*Id*., p. 101). Prescriptions for Depakote, Risperidone, and Diazepam were refilled. (*Id*., p. 102). Dr. Kuykendall again encouraged Plaintiff to stop using tobacco products and follow up in six months. (*Id*.).

Goyette returned to Dr. Kuykendall on May 2, 2018, complaining of headaches, nausea, diarrhea, and a cough. (ECF No. 14-7, pp. 95-97). His physical exam was mostly normal, but his affect was flat. (*Id*., p. 96). Dr. Kuykendall diagnosed acute bronchitis, nicotine dependence, and bipolar disorder. (*Id*.). Goyette was prescribed Cephalexin and was encouraged to stop using tobacco products. (*Id*.).

On August 22, 2018, Goyette was seen by Christina Couch, Psy.D., for a consultative mental diagnostic evaluation. (ECF No. 14-7, pp. 149-161). Goyette recounted the welding accident in which he suffered burns and asserted that he has had intrusive and unwanted thoughts,

and nightmares about the fire. (*Id.*, p. 149-150). As a result, he avoids fire, smoke, welding, screaming or loud people, and loud noises, including fireworks. (*Id.*). Goyette lost interest in things after the accident and described increased irritability, hypervigilance, and having a heightened startle response. (*Id.*). He also reported problems related to concentration due to head trauma in the fire. (*Id.*). Specifically, he stated, "[m]y long term and short-term memory are messed up. It's hard for me to remember the things that I have to do. I get confused and mad." (*Id.*). Goyette endorsed increased energy if he was off his medications, needing to talk a lot, and engaging in excessive pleasurable activities regardless of the consequences. (*Id.*, p. 150). He denied suicidal and homicidal ideation, intent, or plan. (*Id.*). During questioning, Goyette stated, "[i]t's probably time to turn myself into the hospital." (*Id.*). He further declared, "[f]irst because my wife abandoned me, and I just want a good friend, to surround myself with good people …" (*Id.*). He denied that he felt the need to go to the hospital due to suicidal or homicidal ideation, intent, or plan. (*Id.*). Goyette stated he could make them [the hospital] think he was suicidal or homicidal, if needed, to get into the hospital, indicating he had done so to end up in Rivendell psychiatric hospital. (*Id.*). His concentration was poor; he struggled with his attention span; and he had difficulty concentrating on reading. (*Id.*, p. 151). Goyette clarified that because of this difficulty, he even had someone else fill out his disability paperwork for him. (*Id.*).

Dr. Couch opined Goyette's thinking at times appeared to be paranoid, suspicious of others, and somewhat delusional, in that he believed others had been out to get him, tried to kill him, and kidnap him. (ECF No. 14-7, p. 151). Goyette's ex-wife was contacted, with his permission, for collateral information relevant to the examination. (*Id.*, p. 152). She stated Goyette becomes manic quickly and gets fixated on things he has no control over. (*Id.*). She said Goyette does not react well, then it snowballs, then he stops eating and sleeping. (*Id.*). She maintained Goyette has

always had mental health issues, but that they worsened after his welding accident. (*Id*.). She endorsed many symptoms of PTSD, bipolar disorder, grandiosity, and reported Goyette has experienced hallucinations. (*Id*., pp. 153-154).

Goyette was 50 minutes late for his appointment with Dr. Couch, and he walked into the office on the phone, unconcerned with his lateness. (ECF No. 14-7, p. 157). He drove himself to the appointment and his hygiene and grooming were adequate. (*Id*.). According to Dr. Couch, Goyette was appropriate and cooperative during the interview, but occasionally evasive. (*Id*.). His speech was spontaneous, clear, articulated, normal in tone and rate. (*Id*.). His affect was appropriate and mood congruent, but he reported being tired. (*Id*.). His thought processes were logical, coherent, and linear with well-connected associations and there was no observed evidence of impairment in this area. (*Id*.). His thought content, however, was paranoid at times and mildly delusional. (*Id*., pp. 157-158). He did not report any perceptual abnormalities and was evasive when asked about this. (*Id*., p. 158). He scored a 27/30 on the Mini Mental State Examination, indicating no cognitive impairment. (*Id*., p. 158). Dr. Couch concluded Goyette did not appear to be functioning within or near the intellectual disability range. (*Id*., p. 158). She diagnosed Goyette with PTSD, other specified bipolar and related disorder, with insufficient symptoms and episodes, and ADHD, combined presentation. (*Id*., p. 160). Dr. Couch felt Goyette had the capacity to communicate effectively and in an intelligible manner on a one-to-one basis, however, if he was stressed, overwhelmed, or around several people, this most likely would be moderately impacted due to his mental health. (*Id*., p. 161). Dr. Couch also noted that Goyette's capacity to cope with the typical mental and cognitive demands of basic work like tasks would be impacted at least moderately due to the symptoms of PTSD, mania, and difficulties with social interactions, especially if he must work with others. (*Id*.). Goyette had the ability to attend and sustain

concentration on basic tasks during the evaluation, however, Dr. Couch noted this would most likely decrease in a work setting at least moderately due to PTSD and symptoms of bipolar disorder. (*Id*.). Dr. Couch explained this would impact Goyette's capacity to sustain persistence in completing tasks within an acceptable time frame. (*Id*.). Specifically, the more stress and expectations placed on Goyette, the more likely he would become overwhelmed and unable to function adequately in a work-like setting. (*Id*.). Dr. Couch found no indications of symptom exaggeration and determined that his symptom allegations were congruent with the overt presentation. (*Id*.). There was no evidence of approximate answers or atypical symptoms, and malingering was not suspected. (*Id*.). Dr. Couch concluded Goyette would need assistance to manage funds. (*Id*.).

On January 3, 2019, Goyette was seen at Arkansas Orthopedic Institute for pain in his upper, middle, and lower back. (ECF No. 14-7, pp. 166-168). While running, Goyette ran into a dog chain that caught his neck causing him to fall. (*Id*., p. 166). He rated his pain at 10/10 and described his symptoms as sharp, stabbing, throbbing, aching, and burning. (*Id*., p. 166). Russell B. Allison, M.D., performed a lumbar spine examination which revealed mostly normal findings. (*Id*., p. 167). There was mild lordotic posture noted of the lumbar spine and mild tenderness noted of the spinous process of the lumbar spine. (*Id*.). Goyette exhibited decreased lumbar extension and lumbar flexion. (*Id*.). Dr. Allison assessed an unspecified closed facture of the lumbar vertebra. (*Id*.). Dr. Allison concluded the fracture would heal on its own and instructed him to return if pain or symptoms arise. (*Id*.).

On January 16, 2019, Goyette was admitted to Johnson Regional Medical Center hospital after he was found unconscious due to a motor vehicle accident. (ECF No. 14-8, pp. 99-109). According to EMS, Goyette had shallow respirations and was unresponsive except to some painful

stimuli. (*Id.*, p. 99). Goyette was allegedly driving, swerved to avoid a deer, and hit a wall or tree. (*Id.*). He could not remember having any head injury and was with a friend after the accident and walking and talking. (*Id.*). Goyette was given Narcan with no significant response and was subsequently admitted to the Intensive Care Unit and neuro checks were initiated. (*Id.*). His EKG showed a normal sinus rhythm with signs of left ventricular hypertrophy. (*Id.*). Blood tests were unremarkable, and Goyette's blood alcohol level was low. (*Id.*). Goyette's urine drug screen was positive for amphetamines, benzodiazepines, and cannabinoids. (*Id.*). A CT scan of Goyette's brain was negative and his blood sugar was 95. (*Id.*). On examination several hours after being seen by the emergency room physician, Goyette became more awake and alert. (*Id.*). The attending physician, Suh Niba, M.D., opined that Goyette's altered mental status and loss of consciousness could be secondary to benzodiazepine overdose or use of illicit drugs. (*Id.*, p. 101). Dr. Niba noted those circumstances could have been the cause of the accident, however, she stated it was difficult to obtain an exact history of what happened because there was no clear report at the time. (*Id.*). Dr. Niba assessed Goyette with altered mental status after the motor vehicle accident, illicit drug overdose, and bipolar disorder. (*Id.*). Thereafter, Plaintiff's altered mental status resolved but he was still agitated. (*Id.*). Plaintiff also underwent an MRI of his brain resulting in a negative cranial MRI. (*Id.*, p. 102).

On February 7, 2019, Goyette was admitted again to Rivendell for seven days. (ECF No. 14-8, pp. 153-155). According to John Schay, M.D., Goyette presented with threatening and aggressive behaviors, depression, and anxiety. (*Id.*, p. 153). Goyette became upset at the Quapaw House where he was in recovery treatment for substance abuse. (*Id.*). Goyette's anger and outburst became very threatening, an incident during which yelling and significant property destruction occurred, including a broken door and window. (*Id.*). Goyette allegedly threatened several staff

at the Quapaw House before being taken to the emergency room. (*Id*.). He stated he has severe paranoia, as evidenced by thinking people are after him and not certain why he feels as such. (*Id*.). Goyette stated, "I keep getting people looking at me like they want to do something." (*Id*.). He feared an urgency of going back to drug use if he did not get help. (*Id*.). His admission diagnoses were schizophrenia, stimulant use dependent disorder, and substance abuse disorder. (*Id*.). Upon admission, Goyette's medications were discontinued, including Celexa, but Zyprexa and Depakote were continued. (*Id*.). Zyprexa was decreased for mood and psychosis. (*Id*.).

The next day, on February 8, 2019, Goyette reported to the attending psychiatrist he was doing okay. (ECF No. 14-8, p. 153). During his exam, Goyette was uncooperative, hostile, isolating, sleeping, and showed poor grooming, poor insight, and poor judgment. (*Id*.). Rivendell staff reported prominent psychosis symptoms. (*Id*.). Three days later, Goyette reported he was feeling okay, but during his examination he was very impulsive. (*Id*.). There was no suicidal or homicidal ideation, and he was less hostile. (*Id*., p. 154). On February 13, 2019, Goyette was doing better with mood and sleep. (*Id*.). He had been attending groups and was less hostile and less labile. (*Id*.). His insight and judgment were improving, still impulsive at times, but he denied any suicidal or homicidal ideation, or auditory verbal hallucinations. (*Id*.). Additionally, there were no side effects from his medications. (*Id*.). Goyette identified coping skills as telling people about God, taking his medicines, running, and biking, and said that his children make life worth living for. (*Id*.). He participated in groups and activities on the unit and created a crisis safety plan to be implemented once discharged. (*Id*.). Goyette's diagnoses at discharge were schizophrenia, stimulant use disorder, and substance abuse disorder. (*Id*.). He was instructed to follow up with Wilbur D. Mills on February 14, 2019, for individual therapy and medication management. (*Id*.). Goyette was prescribed Zyprexa for mood and psychosis, and Depakote for

mood. (*Id*.). His prognosis was noted to be fair, and he was instructed to follow-up with outpatient therapy and take medications as prescribed. (*Id*., pp. 154-155).

On December 16, 2019, Dr. Kuykendall performed a mental residual functional capacity assessment of Goyette. (ECF No. 14-8, p. 151). Dr. Kuykendall opined Goyette had no useful ability to function on a sustained basis, defined as an eight-hour work day for five days in a full work week, in the following areas: understand, remember, and carry out short simple instructions; maintain attention and concentration for extended periods of time; demonstrate reliability and/or perform activities within a schedule, maintain regular attendance, or be punctual; function independently and/or sustain an ordinary routine without supervision; respond appropriately to supervision, co-workers, and usual work setting; work in coordination with or proximity to others without being distracted by them; make simple work-related decisions; complete a normal work day and work week without interruptions from psychologically based symptoms; interact appropriately with the general public; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; respond appropriately to changes in the work setting; set realistic goals or make plans independently of others; follow and/or remember work rules; and behave in an emotionally stable manner and/or relate predictably in social situations. (*Id*.).

## IV.    Discussion

Goyette raises the following issues on appeal: (1) whether the ALJ erred in fairly and fully developing the record; (2) whether the ALJ properly evaluated Goyette's mental impairments; (3) whether the ALJ erred in evaluating Goyette's subjective complaints; and (4) whether the ALJ erred in his RFC determination. (ECF No. 17, pp. 7-21). After thoroughly reviewing the record, we find that substantial evidence does not support the ALJ's RFC finding. Because we agree that

the ALJ's RFC finding is not supported by substantial evidence and remand is necessary, the other issues will not be addressed.

RFC is the most a person can do despite that person's limitations. 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1). It is defined as the individual's capacity for work activity "on a regular and continuing basis." 20 C.F.R. §§ 404.1545(b), (c) and 416.945(b), (c). A disability claimant has the burden of establishing his RFC. *Vossen*, 612 F. 3d at 1016. "The ALJ determines a claimant's RFC based on all relevant evidence in the record, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010); *Davidson v. Astrue*, 578 F.3d 838, 844 (8th Cir. 2009). Limitations resulting from symptoms such as pain are also factored into the assessment. 20 C.F.R. §§ 404.1545(a)(3), 416.945(a)(3). The Eighth Circuit has held that a "claimant's residual functional capacity is a medical question." *Miller*, 784 F.3d at 479 (citing *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). Therefore, an ALJ's determination concerning a claimant's RFC must be supported by medical evidence that addresses the claimant's ability to function in the workplace. *Perks v. Astrue*, 687 F.3d 1086, 1092 (8th Cir. 2012).

The ALJ found Dr. Kuykendall's medical source statement unpersuasive, however, when a checkbox or conclusory medical source does not provide extensive explanations, the ALJ is required to view the medical source opinion in the in the context of a claimant's medical record. *See Despain v. Berryhill*, 926 F.3d 1024, 1028 (8th Cir. 2019) (citing *Cox v. Barnhart*, 345 F.3d 606, 609 (8th Cir. 2003)); *see also Phillips v. Saul*, No. 1:19-CV-34-BD, 2020 WL 3451519, at *3 (E.D. Ark. June 24, 2020) (applying *Despain* to a medical source opinion evaluated according to § 404.1520c); *John B. H. v. Saul*, No. 4:20-CV-04080-VLD, 2021 WL 1192930, at *26 (D.S.D. Mar. 30, 2021) (citing *Phillips*). While the ALJ found Dr. Kuykendall's checklist medical source

statement unsupported by his own treatment records and inconsistent with the record as a whole, it is unclear how Dr. Kuykendall's opinion is inconsistent with the opinions of other medical and non-medical sources, as the ALJ did not cite any specific records that are inconsistent with Dr. Kuykendall's opinion or specify how, or which, other evidence contradicts Dr. Kuykendall's opinion. *See Phillips*, 2020 WL 3451519, at *3. In his decision, the ALJ recounted medical record evidence from before and during the relevant disability period. (ECF No. 14-2, pp. 13-27). The ALJ stated, "[t]here is no indication in Dr. Kuykendall's records that he recommended the claimant seek counseling." (*Id.*, p. 22-23). However, on July 3, 2017, when Goyette presented for a wellness exam, Dr. Kuykendall *did* refer Goyette to counseling. (ECF No. 14-7, pp. 132-134). An ALJ is not required to explain all the evidence in the record, *see Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010), however, he cannot pick and choose only the evidence that buttresses his conclusion. *See Nelson v. Saul*, 413 F.Supp.3d 886, 916 (E.D. Mo. 2019).

Goyette has been hospitalized numerous times due to his mental impairments and psychotic episodes, including in-patient psychiatric treatment lasting multiple days. (ECF No. 14-7, pp. 43-46, 51-68, 72-88; ECF No. 14-8, pp. 153-155). The record contains substantial medical evidence of medication adjustments made by Goyette's primary care provider and his attending psychiatrists on the occasions when he was admitted to Rivendell psychiatric hospital. (*Id.*, pp. 72-88, 113, 130-131, 133-134, 153-155).

During Goyette's mental diagnostic evaluation with Dr. Couch, she opined that if Goyette is stressed, overwhelmed, or around several people, his capacity to communicate effectively and in an intelligible manner on a one-to-one basis would be moderately impacted due to his mental health. (ECF No. 14-7, p. 161). Dr. Couch noted that Goyette's capacity to cope with the typical mental and cognitive demands of basic work like tasks would be impacted at least moderately due

to PTSD, mania, and difficulties with social interactions.  Especially if he must work with others.  (*Id*.).  Dr. Couch further maintained Goyette had the ability to attend and sustain concentration on basic tasks during the evaluation, however, she posited that "[t]his however most likely would decrease in a work setting, at least moderately due to PTSD and symptoms of [b]ipolar [d]isorder.  (*Id*.).  Dr. Couch added, "[t]his would then impact his capacity to sustain persistence in completing tasks and to do so within an acceptable time frame." (*Id*.).  Dr. Couch concluded it was likely that the more stress and expectations placed on Goyette, the more likely he would become overwhelmed and unable to function adequately in a work like setting.  (*Id*.).

At the administrative hearing, Goyette's counsel presented the VE with the following question:

> Mr. Spragins, instead of we have someone that's going to be absent, if we instead reduced the mental capacity to the point that they're going to be unable on a sustained basis to respond to routine instruction, to interact appropriately with supervisors, coworkers, or the general public, would you agree with me that that eliminates the jobs that you mentioned.  (ECF No. 14-2, p. 63).

In response, the VE replied, "[y]es, ma'am." (*Id*.).

While the ALJ noted there was no indication in the medical records that any of Goyette's treating physicians recommended that he restrict his activities in any manner that would affect his ability to work, Dr. Kuykendall, who had treated Goyette since May 2017 and thus had a longitudinal treatment history with Goyette, did provide a medical source statement on December 16, 2019, stating that Goyette had no useful ability to function on a sustained basis in numerous functional areas.  Further, the ALJ did not ask any of Goyette's physicians or treating sources to complete RFC assessments, despite the substantial evidence of Goyette's severe mental impairments and episodes of manic behavior.

Goyette's medical records do reveal that his symptoms waxed and waned, and recognition must be given to the instability of mental impairments and their waxing and waning nature after manifestation. *See Lillard v. Berryhill*, 376 F. Supp. 3d 963, 984 (E.D. Mo. 2019) (citing *Rowland v. Astrue*, 673 F.Supp.2d 902, 920-21 (D.S.D. 2009). The evaluation of a mental impairment is often more complicated than the evaluation of a claimed physical impairment. *Andler v. Chater*, 100 F.3d 1389, 1393 (8th Cir. 1996). Evidence of symptom-free periods, which may negate the finding of a physical disability, do not compel a finding that disability based on a mental disorder has ceased. (*Id*.). Mental illness can be extremely difficult to predict, and remissions are often of "uncertain duration and marked by the impending possibility of relapse." (*Id*.). This is underscored by Goyette's stated fear when he was admitted to Rivendell a second time and felt urgency coming back to drug use if he did not get help. (ECF No. 14-8, p. 153). Further, individuals suffering from mental disorders often have their lives structured to minimize stress and help control their symptoms, indicating that they may be more impaired than their symptoms indicate. *See Hutsell v. Massanari*, 259 F.3d 707, 711 (8th Cir. 2001); *see also Maestri v. Colvin*, No. 2:15-CV-2125-PKH-MEF, 2016 WL 4523890, at *3 (W.D. Ark. Aug. 8, 2016), report and recommendation adopted, No. 2:15-CV-2125, 2016 WL 4523899 (W.D. Ark. Aug. 29, 2016).

Considering the record, simply limiting Goyette to performing work involving simple tasks, learned by rote, with simple instructions and few variables, with only incidental contact with the public, and where supervision required is direct and concrete, does not adequately account for the functional limitations imposed by Goyette's severe mental impairments. According to testimony, Goyette was unable to keep a job due to problems getting along with co-workers and arguing with supervisors. Both Dr. Kuykendall and Dr. Counce found that Goyette's capacity to cope with the typical mental and cognitive demands of basic work like tasks would be impacted

due to his mental impairments, especially if he must work with others, but the ALJ's mental RFC finding only limits Goyette to incidental contact with the public and makes no mention of interpersonal restrictions related to co-workers and supervisors.

Both Dr. Kuykendall and Dr. Crouch also assessed that Goyette would have problems sustaining concentration on basic tasks in a work setting, and in sustaining persistence in completing tasks within an acceptable time frame. And as Dr. Crouch stated, as more stress and expectations were placed on Goyette, the more likely he would become overwhelmed and unable to function adequately in a work like setting.

As the Eighth Circuit stated in *McCoy v. Schweiker*, 683 F.2d 1138, 1147 (8th Cir. 1982) (en banc) (abrogated on other grounds by *Higgins v. Apfel*, 222 F.3d 504, 505 (8th Cir. 2000)), the test is whether a claimant has "the ability to perform the requisite physical [or mental] acts day in and day out, in the sometimes competitive and stressful conditions in which real people work in the real world." The record just does not support a finding that Goyette can do so in accordance with the mental RFC determined by the ALJ.

After thoroughly reviewing the record, we do not find the ALJ's mental RFC finding supported by substantial evidence. The decision denying benefits should be reversed and the case remanded to the Commissioner for reconsideration of Goyette's mental RFC.

## V.    Conclusion

Based upon the foregoing, it is recommended that the Commissioner's decision denying benefits be reversed and remanded for further consideration pursuant to sentence four of 42 U.S.C. § 405(g).

**The parties have fourteen (14) days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely**

**objections may result in waiver of the right to appeal questions of fact. We remind the parties that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 20th day of January 2022.

/s/ Mark E. Ford

HON. MARK E. FORD
CHIEF UNITED STATES MAGISTRATE JUDGE